## I. MARSHALL FREESE

### *v.*

## MARGARET L. IDESON, Administratrix of the Estate of JOHN B. IDESON, Deceased.

PARTNERSHIP—*interpretation of particular agreement between partners.* I and F entered into a written agreement, whereby F advanced to I $10,000, to be used by him at his saw mill in Wisconsin, and I agreed to consign to F, at Chicago, all the lumber manufactured by him during a certain period, and which F was to sell, retaining his advances out of the proceeds. F had the option of either selling the lumber by the cargo, or of yarding it, and if he sold in the former mode, he was to have a certain per cent. as his commissions, and if in the latter, one-half of the profits over and above all cost, I agreeing that the cost should not be above a fixed sum. Afterwards, and before any lumber was received under this agreement, a second one was entered into, by the terms of which the former one was continued in force, but as amended by the second, and which created a partnership between them, under the name of I and F, "for the sale of the product of the aforesaid saw mill," and also for the purchase and sale of lumber at Chicago. This agreement provided, that the product of I's mill should be charged to the yard of I & F, at $1.00 per thousand less than the market rates at the time of the arrival of each cargo at Chicago, or should be invoiced to the yard at the net cost of manufacture. The option between these two modes was left to F, who was to make his election and signify it to I within a certain time, and which he did, and elected to take by the former mode: *Held,* that these agreements did not create a partnership in the profits of the lumber manufactured by I, at his mill; that F, by his election, became the mere purchaser of the lumber at a fixed price with reference to the market rates, taking no interest in either the losses or gains that may have attended its manufacture.

APPEAL from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

The facts in this case sufficiently appear in the opinion.

Mr. JOHN N. JEWETT, for the appellant.

Messrs. WALKER & DEXTER, for the appellee.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

We should be very glad to reverse this decree, and direct a settlement of the affairs of this partnership upon a basis which would give a fairer compensation to the appellant for his services and capital, if the contract of the parties would permit. But it does not. We have given full consideration to the carefully prepared argument of the counsel of appellant, but the provisions of the written agreements are too plain to be changed by any ingenuity of reasoning. The parties have made their contract, and by that they must abide. It was certainly an unwise one on the part of Freese, but he entered into it voluntarily and without fraud on the part of Ideson. This is admitted by counsel, and it is further admitted that the cross-bill to reform the agreement was properly dismissed, there being no evidence upon which it can stand. Neither is it pretended that the written agreements were ever changed by any other written contract, or that they were abandoned. Whatever they were or meant, they remained in full force up to the death of Ideson, and the rights of the parties must depend on their interpretation.

The only question made in the argument is, whether Freese and Ideson were partners in the manufacture of lumber at the Oconto Mills, in Wisconsin, as well as in the purchase and sale of lumber at Chicago. If the partnership did not extend to the manufacture, it is admitted the decree of the superior court is correct. At the time the first agreement was entered into, on the 13th of November, 1865, Ideson was the owner of the mills and engaged in the manufacture of lumber, and Freese had been engaged in buying and selling lumber at Chicago. By that agreement, Freese advanced to Ideson the sum of $10,000 to be used at his mills, and Ideson agreed to deliver to Freese, at Chicago, all the lumber manufactured between the 1st of March and the 1st of December, 1866, at the rate of about 200,000 feet per week. Freese was to have

the option of either selling the lumber afloat in the Chicago harbor at a commission of $2\frac{1}{2}$ per cent., retaining his advances out of the proceeds, or of yarding the lumber, and in the latter event the profits upon the lumber placed upon the yard, over and above all costs and expenses, were to be equally divided between the parties, Ideson agreeing that the cost, including all expenses, should not exceed ten dollars per thousand. In this agreement there was certainly nothing which can be construed to create a partnership in the mills. Freese loaned his money, and, as a consideration therefor, was to have the consignment of all the lumber manufactured by Ideson, which Freese was to sell. If he sold in one mode he was to have a fixed per cent. as his commission; if in another, his commissions were to be adjusted by a division of the excess of the proceeds of sale over the cost, Ideson stipulating that the cost should not be above a certain sum. In either event, Freese was to get back his money from the proceeds. Freese takes no risk as to the cost of manufacture, except so far as the extent of his profits may depend upon the cost, and even as to them, he limits his risk, by requiring that the lumber shall be furnished to him within a certain price. There is not a word in the agreement tending to make him liable personally for anything connected with the mills.

But on the 1st of April, 1866, and before any lumber had been received under the first agreement, a second and much more minute and carefully prepared contract was executed by these parties. This agreement provides that the former one shall continue in force, but as amended by the one then made, and creates a partnership between the parties, under the name of Ideson & Freese, "for the sale of the product of the aforesaid saw mill," and also for the general purchase and sale of lumber at Chicago. It provides, "that the product of the aforesaid saw mill of the party of the first part, John B. Ideson," shall be charged to the yard of Ideson & Freese at one dollar per thousand less than the market rates at the time of

25—49TH ILL.

the arrival of each cargo in the Chicago river, or else invoiced, to the yard at the net cost of manufacture, and the option between these two modes is left to Freese, who was to signify his option by a written notice to Ideson, by or before the 1st day of May, 1866. By the acceptance of one proposition he would acquire that interest in the profits of the mills which he now claims. By the acceptance of the other he becomes a mere purchaser of the lumber at a price fixed with reference to the market rates, and takes no interest whatever in either the losses or gains that may attend the manufacture. On the 30th of April Freese signified his option by giving to Ideson the following notice:

CHICAGO, April 30, 1866.

JOHN B. IDESON, ESQ.:

As per stipulation in our articles of agreement, we hereby notify you that we will receive the product or cut of all good merchantable lumber of the Oconto Mills, at Oconto, Wis., at the rate of $1.00 less per thousand feet than the cargo lumber market price at the time of the arrival of each and every cargo in the Chicago market; at which rate of $1.00 less per thousand feet than the cargo price at the time of its arrival, each cargo is to be invoiced to the lumber firm of Ideson & Freese.

I. M. FREESE & CO.

By this notice Freese elected to take the lumber at one dollar per thousand less than market rates, instead of incurring any risk as to the cost of manufacture, or participating in its profits.

The result has proved that he made a very unfortunate choice. But nevertheless he made it, and he did so deliberately, and without fraud or coercion. The estate of Ideson is to receive a very large profit from the manufacture of the

lumber, and Freese a very small one from its sale. But it is the result of his own free and well-considered act.

That this instrument, in connection with the notice of the 30th of April, excludes all idea of partnership in the mill, is a proposition hardly admitting of argument.

A large amount of evidence has been taken for the purpose of showing the circumstances of the parties, their acts, admissions and declarations, their printed cards and circulars, in which "our mills at Oconto," and "our manufacturing and shipping facilities," are mentioned, the mode adopted by the parties in keeping their accounts and transacting their business, and it is urged that all this evidence is, in the language of counsel, "a demonstration amounting to moral certainty that the written memoranda between Ideson and Freese do not contain all the agreement of the parties." But that another agreement has ever been reduced to writing is not pretended. And do counsel expect us to take evidence of this nature, much of it contradictory, and nearly all of a nature which courts regard with jealousy in any case, and out of its *disjecta membra*, construct a contract on the theory of probabilities, with which to overturn another contract carefully prepared, deliberately reduced to writing, and signed and sealed by the parties? Could we make a decision more fraught with mischief? The object of persons in reducing their contracts to writing is to place them beyond dispute, and such contracts the law scrupulously guards against the encroachments of parol evidence, yet the decision we are asked to pronounce would break down the sanctity of written instruments, and leave the courts to substitute in their place such contracts as they may choose to infer from careless conversations or partially understood acts. Let this be law, and no care or solemnity in the execution of written contracts would render them safe.

We do not deem it necessary to discuss in any detail the evidence offered, for the reason that, if it were vastly stronger

196      FREESE *v.* IDESON, ADM'X, ETC.      [Sept. T.,

· Opinion of the Court.

than it is, it could not overturn the written agreement of the parties. The argument is, that they did and said certain things indicating that they construed their written agreements as creating a partnership in the profits of lumber manufactured at the Oconto Mills, or that, if they did not so construe these agreements, they must have had some other and outside contract. Yet, when we turn to these agreements, we find they do not create such a partnership, but as clearly as possible repudiate it, and if acts or declarations to the contrary are quoted, we can only say that here, in these written agreements, are we to look for the relations of the parties upon this question, and they admit of but one construction. As to a different contract, modifying the written agreements, we can not construct it, upon conjecture, from the evidence here offered, without violating the best settled rules of law.

Before leaving the case it may be remarked, that although the counsel of appellant characterizes these agreements as memoranda, the one last executed is much more than a memorandum, if by that term is meant a hastily prepared or ill-considered instrument. Its phraseology may indicate that it was not drawn by one learned in the law, but it is nevertheless drawn with great care, for the purpose of defining the relations of the parties, and its various provisions, in regard to minor matters, show with what full consideration it was prepared, signed and sealed.

The decree must be affirmed.

*Decree affirmed.*